JUDGE KEENAN

14 CV 6942

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



RECEIVED
AUG 26 2014
U.S.D.C. S.D. N.Y.
CASHIERS

| | |
|---|---|
| RICHARD STECK, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>SANTANDER CONSUMER USA HOLDINGS INC., THOMAS G. DUNDON, JASON KULAS, JUAN CARLOS ALVAREZ, ROMAN BLANCO, GONZALO DE LAS HERAS, STEPHEN A. FERRISS, MATTHEW KABAKER, TAGAR OLSON, ALBERTO SÁNCHEZ, JAVIER SAN FELIX, JUAN ANDRES YANES, DANIEL ZILBERMAN, CITIGROUP GLOBAL MARKETS INC., J.P. MORGAN SECURITIES LLC, MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, DEUTSCHE BANK SECURITIES INC., SANTANDER INVESTMENT SECURITIES INC., BARCLAYS CAPITAL INC., GOLDMAN, SACHS & CO., MORGAN STANLEY & CO. LLC, RBC CAPITAL MARKETS, LLC, BMO CAPITAL MARKETS CORP., CREDIT SUISSE SECURITIES (USA) LLC, UBS SECURITIES LLC, WELLS FARGO SECURITIES, LLC, KKR CAPITAL MARKETS LLC, SANDLER O'NEILL & PARTNERS, L.P., STEPHENS INC., and LOYAL3 SECURITIES, INC.,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>**JURY TRIAL DEMANDED**</u> |

Plaintiff Richard Steck ("Plaintiff"), by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by SANTANDER CONSUMER USA HOLDINGS INC. ("Santander" or the "Company"), with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Santander; and (c) review of other publicly available information concerning Santander.

## NATURE OF THE ACTION AND OVERVIEW

1.     This is a federal securities class action on behalf of persons or entities who purchased or otherwise acquired Santander securities pursuant and/or traceable to the Company's Registration Statement and Prospectus (collectively, the "Registration Statement") issued in connection with the Company's initial public offering on or about January 23, 2014 (the "IPO" or the "Offering"), seeking to recover damages caused by Defendants' violations of federal securities laws and to pursue remedies under Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act").

2.     Santander is the holding company for Santander Consumer USA Inc., an Illinois corporation ("SCUSA Illinois"), and subsidiaries, a specialized consumer finance company focused on vehicle finance and unsecured consumer lending products.  The Company's primary business is the indirect origination of retail installment contracts principally through manufacturer-franchised dealers in connection with their sale of new and used vehicles to retail consumers.

3.      The Company is owned approximately 60.5% by Santander Holdings USA, Inc. ("SHUSA"), a subsidiary of Banco Santander, S.A. ("Banco Santander"), approximately 4.1% by Sponsor Auto Finance Holdings Series LP ("Auto Finance Holdings"), approximately 10.0% by DDFS LLC, an entity affiliated with Thomas G. Dundon, the Company's Chairman and Chief Executive Officer ("CEO"), approximately 25.3% by public shareholders, and approximately 0.1% by other holders, primarily members of senior management.

4.      On January 23, 2014, Santander completed its IPO, in which selling stockholders offered and sold 85,242,042 shares of Class A common stock at a price of $24.00. According to the Company, Santander did not receive any net proceeds from the IPO.

5.      On August 7, 2014, after the market closed, Santander revealed that the Company had received a civil subpoena from the United States Department of Justice (the "DOJ") under the Financial Institutions Reform, Recovery and Enforcement Act ("FIRREA") requesting the production of documents and communications related to the Company's underwriting and securitization of nonprime auto loans since 2007.

6.      On this news, shares of Santander declined $0.28 per share, over 1%, to close on August 8, 2014, at $17.95 per share, on unusually heavy volume. This represented a 25% decline in Santander's stock price from the IPO price of $24.00.

7.      As detailed below, the Registration Statement and Prospectus contained materially false and misleading statements and omitted material information in violation of the Securities Act.

## JURISDICTION AND VENUE

8.      The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o).

9.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act (15 U.S.C. § 77v).

10.    Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and 15 U.S.C. § 77v.  A significant portion of Defendants' actions, and the subsequent damages, took place in this Judicial District.  Additionally, many of the Underwriter Defendants are located within this Judicial District.

11.    In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

12.    Plaintiff Richard Steck, as set forth in the accompanying certification, incorporated by reference herein, purchased Santander common stock pursuant and/or traceable to the Registration Statement issued in connection with the Company's IPO, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

13.    Defendant Santander is a Delaware corporation with its principal executive offices located at 1601 Elm Street, Suite 800, Dallas, Texas 75201.

14.    Defendant Thomas G. Dundon ("Dundon") was, at all relevant times, CEO and a director of Santander, and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

15.     Defendant Jason Kulas ("Kulas") was, at all relevant times, Chief Financial Officer ("CFO") of Santander, and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

16.     Defendant Juan Carlos Alvarez ("Alvarez") was, at all relevant times, a director of Santander until April 29, 2014, and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

17.     Defendant Roman Blanco ("Blanco") was, at all relevant times, a director of Santander and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

18.     Defendant Gonzalo de Las Heras ("de Las Heras") was, at all relevant times, a director of Santander and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

19.     Defendant Stephen A. Ferriss ("Ferriss") was, at all relevant times, a director of Santander and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

20.     Defendant Matthew Kabaker ("Kabaker") was, at all relevant times, a director of Santander and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

21.     Defendant Tagar Olson ("Olson") was, at all relevant times, a director of Santander and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

22.    Defendant Alberto Sánchez ("Sánchez") was, at all relevant times, a director of Santander and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

23.    Defendant Javier San Felix ("San Felix") was, at all relevant times, a director of Santander and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

24.    Defendant Juan Andres Yanes ("Yanes") was, at all relevant times, a director of Santander until June 24, 2014, and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

25.    Defendant Daniel Zilberman ("Zilberman") was, at all relevant times, a director of Santander and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

26.    Defendants Dundon, Kulas, Alvarez, Blanco, de Las Heras, Ferriss, Kabaker, Olson, Sánchez, San Felix, Yanes, and Zilberman are collectively referred to hereinafter as the "Individual Defendants."   The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Santander's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.   Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations

which were being made were then materially false and/or misleading.   The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

27.   Defendant Citigroup Global Markets Inc. ("Citigroup") served as an underwriter, global coordinator, and joint book-running manager of the Company's IPO.   In the Offering, Citigroup agreed to purchase 14,998,294 shares of Santander, exclusive of the over-allotment option.

28.   Defendant J.P. Morgan Securities LLC ("J.P. Morgan") served as an underwriter, global coordinator, and joint book-running manager of the Company's IPO.   In the Offering, J.P. Morgan agreed to purchase 14,998,294 shares of Santander, exclusive of the over-allotment option.

29.   Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") served as an underwriter and joint book-running manager of the Company's IPO.   In the Offering, Merrill Lynch agreed to purchase 6,131,803 shares of Santander, exclusive of the over-allotment option.

30.   Defendant Deutsche Bank Securities Inc. ("Deutsche") served as an underwriter to Santander in connection with the Offering.   In the Offering, Deutsche agreed to purchase 6,131,803 shares of Santander, exclusive of the over-allotment option.

31.   Defendant Santander Investment Securities Inc. ("Santander Investment") served as an underwriter to Santander in connection with the Offering.   In the Offering, Santander Investment agreed to purchase 6,131,803 shares of Santander, exclusive of the over-allotment option.

32.     Defendant Barclays Capital Inc. ("Barclays") served as an underwriter to Santander in connection with the Offering.   In the Offering, Barclays agreed to purchase 3,532,098 shares of Santander, exclusive of the over-allotment option.

33.     Defendant Goldman, Sachs & Co. ("Goldman") served as an underwriter to Santander in connection with the Offering.   In the Offering, Goldman agreed to purchase 3,532,098 shares of Santander, exclusive of the over-allotment option.

34.     Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") served as an underwriter to Santander in connection with the Offering.   In the Offering, Morgan Stanley agreed to purchase 3,532,098 shares of Santander, exclusive of the over-allotment option.

35.     Defendant RBC Capital Markets, LLC ("RBC") served as an underwriter to Santander in connection with the Offering.   In the Offering, RBC agreed to purchase 3,532,098 shares of Santander, exclusive of the over-allotment option.

36.     Defendant BMO Capital Markets Corp. ("BMO") served as an underwriter to Santander in connection with the Offering.   In the Offering, BMO agreed to purchase 2,624,701 shares of Santander, exclusive of the over-allotment option.

37.     Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") served as an underwriter to Santander in connection with the Offering.   In the Offering, Credit Suisse agreed to purchase 2,624,701 shares of Santander, exclusive of the over-allotment option.

38.     Defendant UBS Securities LLC ("UBS") served as an underwriter to Santander in connection with the Offering.   In the Offering, UBS agreed to purchase 2,624,701 shares of Santander, exclusive of the over-allotment option.

39.     Defendant Wells Fargo Securities, LLC ("Wells Fargo") served as an underwriter to Santander in connection with the Offering.  In the Offering, Wells Fargo agreed to purchase 2,624,701 shares of Santander, exclusive of the over-allotment option.

40.     Defendant KKR Capital Markets LLC ("KKR") served as an underwriter to Santander in connection with the Offering.  In the Offering, KKR agreed to purchase 1,124,872 shares of Santander, exclusive of the over-allotment option.

41.     Defendant Sandler O'Neill & Partners, L.P. ("Sandler") served as an underwriter to Santander in connection with the Offering.  In the Offering, Sandler agreed to purchase 397,455 shares of Santander, exclusive of the over-allotment option.

42.     Defendant Stephens Inc. ("Stephens") served as an underwriter to Santander in connection with the Offering.  In the Offering, Stephens agreed to purchase 397,455 shares of Santander, exclusive of the over-allotment option.

43.     Defendant LOYAL3 Securities, Inc. ("LOYAL3") served as an underwriter to Santander in connection with the Offering.  In the Offering, LOYAL3 agreed to purchase 52,495 shares of Santander, exclusive of the over-allotment option.

44.     Defendants Citigroup, J.P. Morgan, Merrill Lynch, Deutsche, Santander Investment, Barclays, Goldman, Morgan Stanley, RBC, BMO, Credit Suisse, UBS, Wells Fargo, KKR, Sandler, Stephens, and LOYAL3 are collectively referred to hereinafter as the "Underwriter Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

45.     Santander is the holding company for SCUSA Illinois, and subsidiaries, a specialized consumer finance company focused on vehicle finance and unsecured consumer

lending products.   The Company's primary business is the indirect origination of retail installment contracts principally through manufacturer-franchised dealers in connection with their sale of new and used vehicles to retail consumers.

46.     On January 22, 2014, the SEC declared effective the Form S-1 that Santander filed on July 3, 2013 and repeatedly amended, until on or about January 22, 2014, when the Company filed with the SEC the final Form S-1/A (collectively, the "Registration Statement") for the IPO.

47.     On January 23, 2014, Santander completed its IPO, in which selling stockholders offered and sold 85,242,042 shares of Class A common stock at a price of $24.00.   According to the Company, Santander did not receive any net proceeds from the IPO.

48.     On or about January 24, 2014, the Company filed with the SEC its final IPO Prospectus, which forms part of the Registration Statement.

### Santander's False and/or Misleading Registration Statement and Prospectus

49.     Under applicable SEC rules and regulations, the Registration Statement was required to disclose known trends, events or uncertainties that were having, and were reasonably likely to have, an impact on the Company's continuing operations.   The Registration Statement was false and misleading because it failed to disclose that Santander had (1) engaged in improper practices related to the Company's subprime auto lending business; (2) misrepresented the quality of the loans the Company had underwritten; and (3) misrepresented the Company's underwriting standards.

50.     With respect to its vehicle loans, the Registration Statement stated, in relevant part:

Historically, we have originated loans primarily through franchised automotive dealers for manufacturers such as Chrysler, Ford, General Motors, and Toyota in connection with the sale of new and used vehicles to retail consumers. We currently have active relationships with over 14,000 such dealers throughout the United States. In February 2013, we entered into a ten-year agreement with Chrysler Group LLC ("Chrysler") whereby we originate private-label loans and leases under the Chrysler Capital brand ("Chrysler Capital") to facilitate Chrysler vehicle retail sales. We also originate loans through selected independent automobile dealers, such as CarMax, through national and regional banks as well as through relationships with other original equipment manufacturers ("OEMs"). Additionally, we directly originate and refinance vehicle loans via our branded online platform, RoadLoans.com, which is available through major online affiliates including Cars.com, AutoTrader.com, Kelley Blue Book, and eBay Motors. Moreover, we periodically purchase retail vehicle loan portfolios from other lenders.

51.     With respect to its consumer finance market, the Registration Statement stated, in

relevant part:

Our primary focus is the vehicle finance segment of the U.S. consumer finance industry. Vehicle finance includes loans and leases taken out by consumers to fund the purchase of new and used automobiles, motorcycles, recreational vehicles ("RVs"), and watercraft. The automobile finance segment comprises the significant majority of the vehicle finance market in the United States. As of September 30, 2013, there were approximately $850 billion of such loans and leases outstanding. Most new and used car purchases in the U.S. are financed with either loans or leases. Historically, used car financing has made up a majority of our business. Most loans in the used car space, which is substantially fragmented, are made to nonprime borrowers and we believe we are a leader in nonprime auto loan originations. We compete with large national and regional banks, which are the biggest lenders in the used car finance space. Through Chrysler Capital and other relationships, we have been increasing, and expect to continue to increase, the proportion of loans and leases that we originate to finance consumer purchases of new automobiles and, by extension, to prime consumers.

We also participate in the unsecured consumer lending market, which includes credit cards, private student loans, point-of-sale financing, and personal loans. This market continues to represent an attractive opportunity for us. Consumers have faced declining access to traditional sources of consumer credit such as credit cards and home equity lines of credit over the past several years, while improving economic conditions have increased consumer demand for access to new sources of financing. We have recently entered into several agreements with other participants in the unsecured consumer lending space to originate point-of-sale financing and personal loans.

In both the vehicle finance and unsecured consumer lending markets, we generate originations indirectly and directly. The indirect model requires relationships with third parties who are generally active in the market, are looking for an additional source of financing for their customers, and agree to direct certain customers to SCUSA. The direct model requires an internally managed platform through which consumers are able to make requests for credit directly to SCUSA. While we have historically focused on the indirect model, we are broadening our presence in the direct vehicle finance market through our RoadLoans.com platform and we are currently building out our direct unsecured consumer lending platform. Additionally, we continue to develop new relationships with third parties to further broaden our origination channels within these markets.

52.     With respect to its vehicle finance loan origination and servicing, the Registration

Statement stated, in relevant part:

Our origination platform delivers automated 24/7 underwriting decision-making through a proprietary, credit-scoring system designed to ensure consistency and efficiency, with dealers receiving a decision in under 10 seconds for 95% of all requests. Every loan application we receive is processed by our risk scoring and pricing models. Our credit scorecard development process is supported by an extensive market database that includes nearly 20 years of historical data on the loans we have acquired as well as extensive consumer finance third-party data. We continuously evaluate loan performance and consumer behavior to improve our underwriting decisions. As a result of our readily adaptable and scalable systems, we are able to quickly implement changes in pricing and scoring credit policy rules and we seek to modify our underwriting standards to match the economic environment. Our scorecard methodology supports underwriting decisions for consumers across the full credit spectrum and has been designed to allow us to maximize modeled risk-adjusted yield for a given consumer's credit profile. As a result of the Chrysler Agreement, we have adjusted underwriting standards in the prime space to compete with the major lenders in the area.

We have built our servicing approach based on years of experience as a nonprime lender. Our servicing activities consist largely of processing customer payments, responding to customer inquiries (such as requests for payoff quotes), processing customer requests for account revisions (such as payment deferrals), maintaining a perfected security interest in the financed vehicle, monitoring vehicle insurance coverage, pursuing collection of delinquent accounts, and remarketing repossessed or off-lease vehicles. We have made significant technology investments in our servicing systems to ensure that our servicing activities are in compliance with federal and local consumer lending rules in all 50 states.

Through our servicing platform, we seek to maximize collections while providing the best possible customer service. Our servicing practices are closely integrated with our origination platform. This results in an efficient exchange of customer

data, market information and understanding of the latest trends in consumer behavior. Our customer account management process is model-driven and utilizes automated customer service and collection strategies, including the use of automated dialers rather than physical phones. Each of the models we use is validated by back-testing with data and can be adjusted to reflect new information that we receive throughout our entire business and to include new vehicle loan and lease applications, refreshed consumer credit data, and consumer behavior that we observe through our servicing operations. Our robust processes and sophisticated technology support our servicing platform to maximize efficiency, consistent loan treatment, and cost control.

In order to provide the best possible customer service, we provide multiple convenience options to our customers and have implemented many strategies to monitor and improve the customer experience. In addition to live agent assistance, our customers are offered a wide range of self-service options via our interactive voice response system and through our customer website. Self-service options include demographic management (such as updating a customer's address, phone number, and other identifying information), payment and payoff capability, payment history reporting, as well as online chat and communication requests. Quality assurance teams perform account reviews and are responsible for grading our phone calls to ensure adherence to our policies and procedures as well as compliance with regulatory rules. Our analytics software converts speech from every call into text so that each of our conversations with a customer can be analyzed and subsequently data-mined. This is used to identify harmful words or phrases in real-time for potential intervention from a manager, and to search for the omission of words or phrases that are required for specific conversations. A quality control team provides an independent, objective assessment of the servicing department's internal control systems and underlying business processes. This helps us identify organizational improvements while protecting our franchise reputation and brand. Lastly, complaint tracking processes ensure customer complaints are addressed appropriately and that the customers receive status updates. These systems assign the account to a specialized team (Office of the President) until the complaint is deemed to be closed. This team tracks and resolves customer complaints and is subject to a robust quality assurance program.

The servicing process is divided into stages based on delinquency status and the collectors for each stage receive specialized training. In the event that a retail installment contract becomes delinquent, we follow an established set of procedures that we believe maximize our ultimate recovery on the loan or lease. Late stage account managers employ skip tracing, utilize specialized negotiation skills, and are trained to tailor their collection attempts based on the proprietary borrower behavioral score we assign to each of our customers. Collection efforts include calling within one business day when an obligor has broken a promise to make a payment on a certain date and using alternative methods of contact such as location gathering via references, employers, landlords, credit bureaus, and cross-

directories. If the borrower is qualified, the account manager may offer an extension of the maturity date, a temporary reduction in payment, or a modification permanently lowering the interest rate or principal. If attempts to work with the customer to cure the delinquency are unsuccessful, the customer is sent a "right to cure" letter in accordance with state laws and the loan is assigned a risk score based on our historical days-to-repossess data. This score is used to prioritize repossessions, and each repossession is systematically assigned to third-party repossession agents according to their recent performance with us. Once the vehicle has been secured, any repairs required are performed and the vehicle is remarketed as quickly as possible, typically through an auction process.

Most of our servicing processes and quality-control measures also serve a dual purpose in that they both ensure compliance with the appropriate regulatory laws and ensure that we deliver the best possible customer service. Additionally, our servicing platform and all of the features we offer to our customers are scalable and can be tailored through statistical modeling and automation.

53.     On May 1, 2014, the Company issued a press release entitled, "Santander Consumer USA Holdings Inc. reports first quarter 2014 net income of $81.5 million, or $0.23 per share, and declares cash dividend of $0.15 per share."  Therein, the Company, in relevant part, stated:

**Core net income of $157.3 million, or $0.44 per diluted share. Return on equity of 11.6 percent, or core return on equity of 22.4 percent, and return on assets of 1.2 percent, or core return on assets of 2.3 percent.**

Santander Consumer USA Holdings Inc. (NYSE: SC) ("SCUSA") today announced net income for first quarter 2014 of $81.5 million, or $0.23 per diluted common share, compared to net income attributable to SCUSA shareholders for first quarter 2013 of $290.4 million, or $0.84 per diluted common share. However, core net income for first quarter 2014 was $157.3 million, or $0.44 per diluted common share compared to fourth quarter 2013 net income of $113.9, or $0.33 per diluted common share. This represents core earnings growth of 38 percent quarter-over-quarter driving core return on equity of 22.4 percent and core return on assets of 2.3 percent. The Board has declared a cash dividend of $0.15 per share, to be paid May 30, 2014 to shareholders of record as of the close of business on May 12, 2014.

*"SCUSA is pleased to report strong results for our first quarter as a public company as core net income grew 38 percent quarter-over-quarter. We continued to demonstrate strong liquidity and capital markets access, issuing more retail auto loan asset-backed securities year-to-date than any other issuer in the market. Our asset origination performance in the first quarter positions us for continued*

*growth and profitability in the coming quarters. We are confident in the financial objectives discussed prior to our IPO with regard to dividend payments of 30 percent, a return on equity of 20-25 percent, and EPS growth of approximately 10 percent. In addition, we've just completed a successful first year for Chrysler Capital, a key growth driver for the company,*" said Tom Dundon , Chairman and Chief Executive Officer.

"*In an environment of increased competition, we are continuing to enhance shareholder value by leveraging our efficient structure and relationships, including Chrysler, to produce profitable asset growth. A further testament to our shareholder commitment is our Board of Directors' decision to declare a dividend on our earnings from our first quarter as a public company. Our balance sheet strength and robust profitability affords us the opportunity to continue to drive total shareholder return,*" said Jason Kulas , President and Chief Financial Officer.

SCUSA produced its highest quarterly origination volume to date in the first quarter, originating more than $6.9 billion in consumer loans and leases, including more than $3.5 billion in Chrysler retail loans and more than $1.2 billion in Chrysler leases. Finance receivables, loans and leases, net, increased to $25.3 billion at March 31, 2014, up 8 percent from $23.4 billion at December 31, 2013 and up 51 percent from $16.7 billion at March 31, 2013, driven by Chrysler Capital and SCUSA's strong origination volume. Due to the Chrysler Capital agreement and other origination opportunities, SCUSA slightly shifted its mix of new originations toward higher credit quality borrowers year-over-year. In the first quarter of 2014, SCUSA's average APR on new retail installment contract originations was 13.7 percent, versus a 17.4 percent average APR on first quarter 2013 originations. While the credit mix shifted toward higher credit quality borrowers, SCUSA maintained its pricing discipline for new originations.

For the first quarter of 2014 as compared to the first quarter of 2013, net interest income increased 43 percent to $1.0 billion, from $732 million, driven by the 51 percent year-over-year portfolio growth. The provision for loan losses increased to $699 million in the first quarter of 2014, from $217 million in the first quarter of 2013. More than half of the provision increase was driven by upfront loan loss provisions related to strong asset growth in the asset portfolio during the quarter, while the majority of the remaining increase is related to building loan loss reserves on the existing portfolio. The allowance for loan losses increased to $2.9 billion in the first quarter of 2014, from $2.5 billion in the fourth quarter of 2013, and from $1.8 billion in the first quarter of 2013. SCUSA's net charge-off ratio declined to 6.4 percent in the first quarter of 2014 from 8.1 percent in the fourth quarter of 2013, as compared to a decline to 3.9 percent in the first quarter of 2013 from 6.4 percent in the fourth quarter of 2012. Additionally, SCUSA's delinquency ratio declined to 3.1 percent as of the first quarter of 2014 from 4.5 percent as of the fourth quarter of 2013, compared to a decline to 3.3 percent as of the first quarter 2013 from 4.6 percent as of the fourth quarter of 2012.

During the quarter, SCUSA incurred $318 million of operating expenses, or $199 million of core operating expenses. Core operating expenses are up 33 percent since the first quarter of 2013, primarily due to SCUSA's strong asset growth over the previous year. SCUSA produced a 27.0 percent efficiency ratio, or 16.9 percent core efficiency ratio, for the quarter, versus 18.4 percent in the same period last year. First quarter results also included nonrecurring pre-tax stock compensation expense totaling $118 million related to options vesting upon SCUSA's initial public offering.

During the quarter, SCUSA continued to show strong access to liquidity with the execution of three secured structured financings totaling $2.7 billion, a Chrysler Capital financing for $765 million, an affiliated revolving credit line for $300 million, and an additional debt facility for $250 million. The sale treatment of the Chrysler Capital financing, along with SCUSA's monthly loan sales to Bank of America and a bulk loan sale to Citizens Bank of Pennsylvania ("CBP"), a subsidiary of RBS Citizens Financial Group, produced $36 million in gains on sale, and contributed to the growth in the portfolio of loans and leases serviced for others by 37 percent to $6.2 billion at March 31, 2014, from $4.5 billion at December 31, 2013. Servicing fee income for the quarter totaled $10.4 million.
Since the quarter end, SCUSA has continued to be active in the capital markets, successfully executing two additional funding initiatives totaling more than $1.7 billion. These initiatives included SCUSA's second public securitization of 2014 and a series of six subordinate bond transactions to fund residual interests from existing securitizations. SCUSA also completed a second sale to CBP of prime Chrysler Capital loans.

**Other Recent Developments**

SCUSA's original equipment manufacturer ("OEM") relationships have recently grown to include another OEM, whereby SCUSA will provide nonprime retail auto financing through a turn-down program[4] for new and used vehicles for this OEM's customers and dealers in the U.S. This agreement was the result of several months of successful testing at select dealers. Additionally, SCUSA continues its discussions with Maserati regarding the Maserati Capital relationship announced early in 2014. In April 2014, SCUSA expanded its unsecured personal lending business by executing an additional agreement with LendingClub Corporation, whereby SCUSA has the first opportunity to review for its own portfolio, applications that do not meet either the public credit policy or custom credit policy facilitated by LendingClub's platform. SCUSA also has recently signed an agreement with a technology company, GreenSky Trade Credit, LLC, whereby GreenSky will facilitate SCUSA's origination of turn-down loans in the retail home improvement space.

(Emphasis in original).

54.     On May 15, 2014, Santander filed its Quarterly Report with the SEC on Form 10-Q for the 2014 fiscal first quarter.   The Company's Form 10-Q was signed by Defendant Dundon, and reaffirmed the Company's financial results previously announced on May 1, 2014.

55.     On July 31, 2014 the Company issued a press release entitled, "Santander Consumer USA Holdings Inc. reports second quarter 2014 net income of $246 million, or $0.69 per diluted common share, up 35 percent from prior year."   Therein, the Company, in relevant part, stated:

**Return on average equity of 33.0 percent, and return on average assets of 3.4 percent.**

Santander Consumer USA Holdings Inc. (NYSE: SC) ("SCUSA") today announced net income for second quarter 2014 of $246.5 million, or $0.69 per diluted common share, compared to net income attributable to SCUSA shareholders for second quarter 2013 of $181.9 million, or $0.53 per diluted common share.

*"Our quarterly net income grew 35 percent from prior year, and net finance and other interest income continues to increase, demonstrating the strong fundamentals of the Company. We continue to operate the business as we always have, resulting in continued positive results for the first half of the year. These results are attributable to SCUSA's sophisticated risk management, capital markets expertise, industry-leading efficiency and continued strength in technology and operations,"* said Tom Dundon, Chairman and Chief Executive Officer.

In the second quarter, total originations were $6.7 billion, including more than $2.6 billion in Chrysler retail loans, more than $1.2 billion in Chrysler leases originated for our own portfolio, and approximately $595 million in Chrysler lease and dealer loan originations facilitated for an affiliate. For the first six months of 2014, origination volume was $14.0 billion, including more than $6.0 billion in Chrysler retail loans, more than $2.4 billion in Chrysler leases, and approximately $1.0 billion in Chrysler lease and dealer loan originations facilitated for an affiliate. Total origination growth was 65 percent for the first half of 2014 versus 2013.

Mr. Dundon noted, *"We continue to sharpen our ability to segment risk and make smart credit decisions as we gather and analyze more Chrysler loan data. In the second quarter, we saw strong total application volume, resulting in stable originations, including originations for others. Through our ongoing relationship*

*with Chrysler, as well as other initiatives including additional dealers and suppliers of loans as part of our normal activity, the originations funnel continues to widen, allowing SCUSA to underwrite loans with returns that give us continued confidence in our ability to achieve profitable growth in-line with our targets. We continue to demonstrate servicing expertise with partners as seen in our serviced for others portfolio growth of 76 percent since December 31, 2013."*

Finance receivables, loans and leases, net, increased 4 percent to $26.5 billion at June 30, 2014 from $25.3 billion at March 31, 2014 and increased 13 percent from $23.4 billion at December 31, 2013, mainly driven by Chrysler Capital. In the second quarter 2014, SCUSA's average APR on retained retail installment contract originations was 16.0 percent, compared with a 15.6 percent average APR on second quarter 2013 retained originations and 16.2 percent APR on first quarter 2014 retained originations. For the first six months of 2014, SCUSA's average APR on retained retail installment contract originations was 16.1 percent, versus a 16.3 percent average APR in the first six months of 2013.

Net finance and other interest income increased 32 percent to $1.1 billion in the second quarter 2014 from $818 million in the second quarter 2013, driven by the 45 percent year-over-year growth in the average portfolio. The provision for loan losses increased to $589 million in the second quarter 2014, from $408 million in the second quarter 2013, and decreased from $699 million in the first quarter 2014. The allowance for loan losses increased to $3.1 billion in the second quarter 2014, from $2.9 billion in the first quarter 2014, resulting in a moderate increase in the allowance to loans ratio to 11.6 percent from 11.0 percent, driven by the seasonality in SCUSA's forward-looking provision model.

*"The allowance to loans ratio has increased moderately due to seasonal impacts. We see the effects of seasonality most notably in the second quarter due to the provision model capturing two fourth quarters of seasonally worse performance; however, absent this impact in the model, we expect to have a stable ratio outlook,"* said Jason Kulas, President and Chief Financial Officer.

SCUSA's net charge-off ratio declined to 5.8 percent for the second quarter 2014 from 6.4 percent for the first quarter 2014, and increased from 4.2 percent for the second quarter 2013. Additionally, SCUSA's delinquency ratio increased to 3.8 percent as of June 30, 2014 from 3.1 percent as of March 31, 2014, and increased from 3.5 percent as of June 30, 2013. The rate at which the portfolio is growing has stabilized in comparison to the growth incurred during the beginning of the Chrysler Capital relationship in 2013, and therefore more moderate origination growth in the second quarter 2014 led to slightly higher delinquency ratios quarter-over-quarter. In line with seasonal trends, we saw a decline in net charge-offs in the second quarter relative to the first quarter.

During the quarter, SCUSA incurred $211 million of operating expenses, up 23 percent from $171 million in the second quarter 2013, primarily due to SCUSA's

strong asset growth over the previous year. SCUSA produced a 17.4 percent efficiency ratio for the quarter, versus 19.6 percent in the same period last year. For the first six months of 2014, operating expenses were $530 million, or $410 million of core operating expenses, versus $320 million for operating expenses and core operating expenses in the first six months of 2013. For the first six months of 2014, SCUSA produced a 22.1 percent efficiency ratio, or 17.1 percent core efficiency ratio, versus 19.1 percent for the same period in 2013. Core year-to-date results exclude nonrecurring pre-tax stock compensation expense from the first quarter totaling $118 million related to options vesting upon SCUSA's initial public offering and an additional $2 million of IPO-related expenses.

During the quarter, SCUSA continued to show strong access to liquidity with the execution of two public securitizations totaling $2.6 billion, over $2.0 billion in private term amortizing facilities, and a series of six subordinate bond transactions totaling $409 million to fund residual interests from existing securitizations.

Additionally, SCUSA continued to develop its forward flow relationships. This quarter we entered into an agreement with Citizens Bank of Pennsylvania ("CBP") whereby CBP has committed to purchase up to $7.2 billion of prime assets over the next three years. During the quarter, SCUSA completed loan sales totaling $1.4 billion through monthly loan sale programs to Bank of America and CBP, and a $369 million bulk lease sale to affiliate Santander Bank, N.A. Servicing fee income totaled $22.1 million in the second quarter 2014, up from $10.4 million for the first quarter 2014 primarily due to the increase in the portfolio of loans and leases serviced for others to $8.0 billion as of June 30, 2014, up from $6.2 billion as of March 31, 2014 and $4.5 billion as of December 31, 2013. For the second quarter 2014, gains on sale totaled $21.6 million, down from $35.8 million in the first quarter 2014, which included an off-balance sheet securitization from the CCART platform (Chrysler Capital prime retail).

(Emphasis in original).

56.    On August 7, 2014, after the market closed, Santander filed its Quarterly Report with the SEC on Form 10-Q for the 2014 fiscal second quarter. The Company's Form 10-Q was signed by Defendants Dundon and Kulas. Therein, the Company, in relevant part, stated:

We recently received a civil subpoena from the U.S. Department of Justice (DOJ) under FIRREA requesting the production of documents and communications that, among other things, relate to the underwriting and securitization of nonprime auto loans since 2007. We are cooperating with this request.

Periodically, we are party to or otherwise involved in other legal proceedings arising in the normal course of business. We have recorded no material reserves

for any cases and do not believe that there are any proceedings threatened or pending that would have a material adverse effect on us if determined adversely.

57.     On this news, shares of Santander declined $0.28 per share, over 1%, to close on August 8, 2014, at $17.95 per share, on unusually heavy volume.  This represented a 25% decline in Santander's stock price from the IPO price of $24.00.

## CLASS ACTION ALLEGATIONS

58.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all those who purchased or otherwise acquired Santander securities pursuant and/or traceable to the Company's Registration Statement and Prospectus issued in connection with the Company's IPO on or about January 23, 2014, seeking to pursue remedies under the Securities Act, and who were damaged thereby (collectively, the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

59.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Santander's securities were actively traded on the New York Stock Exchange (the "NYSE").  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  The Company, through the selling stockholders, offered 85,242,042 shares of Class A common stock in the IPO.  Record owners and other members of the Class may be identified from records maintained by Santander or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

60.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

61.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

62.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the Securities Act was violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public in connection with the Company's IPO omitted and/or misrepresented material facts about the business, operations, and prospects of Santander; and

63.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

**FIRST CLAIM**
**Violation of Section 11 of The Securities Act**
**(Against all Defendants)**

64.     Plaintiff repeats and realleges each and every allegation contained above, except any allegation of fraud, recklessness or intentional misconduct.

65.     This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants.

66.     The Registration Statement for the IPO was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

67.     Santander is the registrant for the IPO.  The Defendants named herein were responsible for the contents and dissemination of the Registration Statement.

68.     As issuer of the shares, Santander is strictly liable to Plaintiff and the Class for the misstatements and omissions.

69.     None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

70.     By reasons of the conduct herein alleged, each Defendant violated, and/or controlled a person who violated Section 11 of the Securities Act.

71.     Plaintiff acquired Santander shares pursuant and/or traceable to the Registration Statement for the IPO.

72.     Plaintiff and the Class have sustained damages.  The value of Santander common stock has declined substantially subsequent to and due to Defendants' violations.

## SECOND CLAIM
### Violation of Section 15 of The Securities Act
### (Against the Individual Defendants)

73.     Plaintiff repeats and realleges each and every allegation contained above, except any allegation of fraud, recklessness or intentional misconduct.

74. This count is asserted against the Individual Defendants and is based upon Section 15 of the Securities Act.

75. The Individual Defendants, by virtue of their offices, directorship, and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of Santander within the meaning of Section 15 of the Securities Act. The Individual Defendants had the power and influence and exercised the same to cause Santander to engage in the acts described herein.

76. The Individual Defendants' positions made them privy to and provided them with actual knowledge of the material facts concealed from Plaintiff and the Class.

77. By virtue of the conduct alleged herein, the Individual Defendants are liable for the aforesaid wrongful conduct and are liable to Plaintiff and the Class for damages suffered.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a) Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b) Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: August 26, 2014

**GLANCY BINKOW & GOLDBERG LLP**

By: _____

Gregory Linkh (GL-0477)
Brian P. Murray (BM-9954)
122 E 42nd Street, Suite 2920
New York, New York 10168
Tel: (212) 682-5340
Fax: (212) 884-0988
Email: glinkh@glancylaw.com

-and-

**GLANCY BINKOW & GOLDBERG LLP**
Lionel Z. Glancy
Michael Goldberg
Robert V. Prongay
Casey E. Sadler
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone:  (310) 201-9150
Facsimile:   (310) 201-9160

**LAW OFFICES OF HOWARD G. SMITH**
Howard G. Smith
3070 Bristol Pike, Suite 112
Bensalem, PA 19020
Telephone: (215) 638-4847
Facsimile: (215) 638-4867

***Attorneys for Plaintiff Richard Steck***

## SWORN CERTIFICATION OF PLAINTIFF

Santander Consumer USA Holdings, Inc., SECURITIES LITIGATION

I, Richard Stock, certify that:

1. I have reviewed the complaint and authorized its filing.

2. I did not purchase Santander Consumer USA Holdings, Inc., the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action arising under this title.

3. I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4. My transactions in Santander Consumer USA Holdings, Inc., during the class period set forth in the Complaint are as follows:

    See Attached Transactions

5. I have not served as a representative party on behalf of a class under this title during the last three years except as stated:

6. I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

    ___ Check here if you are a current employee or former employee of the defendant Company.

    I declare under penalty of perjury that the foregoing are true and correct statements.

Dated: 8/21/2014

_____
(Please Sign Your Name Above)

| Richard Steck's Transactions in Santander Consumer Holdings USA, Inc (SC) | | | |
|---|---|---|---|
| **Transaction Type** | **Date** | **Shares** | **Price** |
| BUY | 01/23/2014 | 104.1667 | $24.00 |

# ATTACHMENT A

SANTANDER CONSUMER USA HOLDINGS INC., THOMAS G. DUNDON, JASON
KULAS, JUAN CARLOS ALVAREZ, ROMAN BLANCO, GONZALO DE LAS HERAS,
STEPHEN A. FERRISS, MATTHEW KABAKER, TAGAR OLSON, ALBERTO SANCHEZ,
JAVIER SAN FELIX, JUAN ANDRES YANES, DANIEL ZILBERMAN, CITIGROUP
GLOBAL MARKETS INC., J.P. MORGAN SECURITIES LLC, MERRILL LYNCH, PIERCE,
FENNER & SMITH INCOPROATED, DEUTSCHE BANK SECURITIES INC.,
SANTANDER INVESTMENT SECURITIES INC., BARCLAYS CAPITAL INC., GOLMAN,
SACHS & CO., MORGAN STANLEY & CO. LLC, RBC CAPITAL MARKETS, LLC, BMO
CAPITAL MARKETS CORP., CREDIT SUISSE SECURITIES (USA) LLC, UBS
SECURITIES LLC, WELLS FARGO SECURITIES, LLC, KKR CAPITAL MARKETS LLC,
SANDLER O'NEILL & PARTNERS, L.P., STEPHENS INC., and LOYAL3 SECURITIES,
INC.,